**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| YONATAN J. PINEDA PINEDA<br><br>Petitioner,<br><br>DAVID WESLING, Acting Field Office Director, ICE Boston Field Office;<br>DAVID VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; and<br>MARKWAYNE MULLIN, U.S. Secretary of Homeland Security,<br>in their official capacities,<br><br>Respondents. | ) | Case No. 1:26-cv-14257<br><br>**AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

1. Petitioner Yonatan Jacobo Pineda Pineda ("Yonatan") is a twenty-six-year-old Salvadoran national who has lived in the United States for approximately six years. He is a resident of Somerville, Massachusetts. Petitioner Decl. ("Exhibit A") ¶¶ 1-2.

2. On September 16, 2026, ICE officers and their agents descended upon Yonatan in the hallway of the Somerville District Court while he conferred with his attorney, grabbed his hands, did not show him any paperwork or explain why he was being arrested. Landlord Decl. ("Exhibit B") ¶¶ 11-14. Yonatan had voluntarily appeared for an arraignment, notwithstanding concerns expressed by friends and community members regarding recent ICE courthouse arrests. *Id.* at ¶ 5. After a lifetime without any encounters with the criminal legal system, he did so to answer allegations that had not been adjudicated and

for which he had not been convicted. *See id*. at ¶ 4. Before he could complete his consultation with counsel or participate further in the proceedings, ICE agents intercepted the arraignment and removed him from the courthouse. Petitioner Decl. ¶ 13. Although startled, flustered and frightened by the sudden arrest, Yonatan remained cooperative. Landlord Decl. ¶ 14. He did not resist or attempt to flee or otherwise interfere with the officers. Some of the ICE officers were in plain clothes. Petitioner Decl. ¶ 11. They ultimately placed Yonatan in an unmarked vehicle with tinted windows and transported him to Burlington. *Id*. at ¶ 16.

3. Petitioner is currently detained at Plymouth County Correctional Facility in Plymouth, Massachusetts.

4. This action is brought to remedy Petitioner's warrantless arrest and resulting detention, which upon information and belief, were effected by federal agents in violation of the Fourth and Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and implementing regulations. ICE effectively arrested a person who voluntarily appeared in court, while consulting with counsel, who showed no signs of absconding and who now remains confined without any individualized determination that his detention continues to serve the civil and nonpunitive purposes for which immigration detention is constitutionally permitted.

## JURISDICTION, VENUE AND HABEAS AUTHORITY

5. This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 2241(c)(3), the Suspension Clause, U.S. Const. art. I, § 9, cl. 2, and the Due Process Clause of the Fifth Amendment.

6. The jurisdiction-channeling provisions of 8 U.S.C. § 1252 do not bar this Petition because Yonatan does not seek review of a removal order, a discretionary removal decision, or the execution of removal. He seeks release from custody imposed without a constitutionally sufficient basis.

7. Venue is proper because Petitioner resides in Massachusetts, was arrested in Massachusetts, and is presently held in custody in the District of Massachusetts.

8. Respondent DAVID WESLING is the Acting Director for the ICE Boston Field Office.

9. Respondent DAVID VENTURELLA is the Acting Director for U.S. Immigration and Customs Enforcement.

10. Respondent MARKWAYNE MULLIN is the United States Secretary of Homeland Security.

11. All Respondents are named in their official capacities.

## FACTUAL BACKGROUND

12. Petitioner Yonatan Jacobo Pineda Pineda entered the United States approximately six years ago. He is a national and citizen of El Salvador. Petitioner Decl. ¶ 1.

13. Petitioner is a resident of Somerville, Massachusetts. *Id*. at ¶ 2.

14. Petitioner has been working as a landscaper and is described by community members as hard working, calm and kind. Landlord Decl. ¶ 3.

15. On September 16, 2026, Petitioner appeared at the Somerville District Court for his arraignment on his first criminal charge based on an accusation he intends to clear. *Id*. at ¶ 6.

16. Petitioner attended the arraignment with the support of his landlord, who observed two individuals in the courtroom watching the proceedings. *Id*. at ¶ 8.

17. During the arraignment, the judge called Yonatan and an attorney was appointed. The Somerville District Court provided Yonatan the opportunity to confer with his lawyer before adjournment. When Yonatan, his lawyer and his landlord stepped into the hallway, the two aforementioned individuals followed. The landlord observed them walking up to an ICE agent who had been standing close by and speaking with him. Before Yonatan could finish his consultation with his attorney, the ICE agent and the two plain-clothed individuals descended upon Yonathan, grabbed his hands and arrested him. *See Id.* at ¶¶ 8-11; Petitioner Decl. ¶¶ 12-14.
18. The ICE agent did not produce any documentation during the arrest. Landlord Decl. ¶ 12; Petitioner Decl. ¶ 15.
19. Upon information and belief, ICE did not present a warrant at the time of arrest.
20. The I-205 "warrant of removal" subsequently disclosed by Respondents bears a photograph appearing to have been taken after Petitioner was transported into ICE custody. *Id.* at ¶ 23.
21. The ICE agent did not explain to Yonatan the basis of his arrest. *Id.* at ¶14.
22. Upon information and belief, when approached by the federal agents, Petitioner was cooperative, albeit stunned. Landlord Decl. ¶ 14.
23. Yonatan was promptly escorted to a black car with tinted windows and transported to Burlington, Massachusetts where, upon information and belief, he was fingerprinted, and his picture was taken. Petitioner Decl. ¶ 16.
24. Upon information and belief, ICE attempted to reinstate a removal order from a previous entry upon detaining him.

25. On September 25, 2026, Yonatan requested a Reasonable Fear Interview with the Asylum Office based on his fear of return to El Salvador. Request for Reasonable Fear Interview ("Exhibit C"). Yonatan fears that, as a visibly tattooed Salvadoran national who has recently been accused of a crime, regardless of its veracity, he may be perceived by Salvadoran authorities as having gang affiliations despite having no gang ties. As widely documented in country conditions materials concerning El Salvador's ongoing State of Exception, tattooed individuals with criminal histories are perceived to have gang affiliations and are often unjustly detained and tortured. *See id*.

26. Respondents cannot remove Yonatan at the current time until he receives an adjudication. Should Yonatan prevail at his Reasonable Fear Interview, he should be placed in removal proceedings where he would defend against removal from the United States.

## LEGAL FRAMEWORK

**A warrant is generally required for an immigration arrest within the United States.**

27. Under federal law, immigration officers may arrest and detain a non-citizen within the United States if a "warrant [is] issued by the Attorney General." 8 U.S.C. § 1226(a). An immigration officer can make an arrest *without* a warrant only if they have "reason to believe" that the individual "is in the United States in violation of any [immigration] law or regulation" *and* the individual "is likely to escape before a warrant can be obtained" for his arrest. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii)(same); s*ee Morales v. Chadbourne,* 793 F.3d 208, 216 (1st Cir. 2015).

28. A warrantless arrest implicates the Fourth Amendment, as it constitutes a seizure within its meaning.

29. The Fourth Amendment extends to noncitizens who have “substantial connections” to the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272-73 (1990) (“[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country”); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 881-92 (1975) (“For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.”); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1046 (1984) (assuming, without deciding, that the Fourth Amendment applies to noncitizens); *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) (“[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike.”)

30. The Fourth Amendment protects from “arbitrary and oppressive interference by enforcement officials.” *U.S. v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).

31. “Fourth Amendment law is premised on a very basic assumption: that individuals know they are dealing with a legitimate law enforcement officer acting under the color of law when they are being seized.” *Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603, 623 (S.D.W. Va. 2026).

32. When agents, as is the case here, in plain clothes grab people without explanation or without a warrant, utilize unmarked vehicles, “and neglect to provide a justification for their seizure of an individual,” the Fourth Amendment is contravened. *Id*.

**In order to conduct a warrantless arrest, determining the likelihood of flight risk is required.**

33. While, in the United States, arrests generally require warrants, in the immigration context Congress authorized warrantless immigration arrests in limited circumstances: when there is probable cause of likely escape before a warrant can be produced. Because warrantless immigration arrests constitute seizures governed by the Fourth Amendment, these statutory limitations perform an important constitutional function by constraining arbitrary exercises of arrest authority.

34. This limitation comports with the longstanding principle that in the United States "liberty is the norm and detention prior to trial the carefully limited exception." *See United States v. Salerno*, 481 U.S. 739, 755 (1987). Congress thus permitted immigration officers to bypass the warrant process *only where* circumstances create a genuine risk that the individual will abscond before a warrant can be obtained. Where there is no reason to believe an individual will abscond before a warrant can be secured, Congress required immigration officers to utilize the warrant process rather than immediately deprive the individual of liberty through a warrantless arrest.

35. The authority of immigration officers to make arrests without a federal warrant is governed by 8 U.S.C. § 1357(a)(2) and its implementing regulation 8 CFR § 287.8(C)(2)(ii). Under these authorities, it is not enough for an immigration officer to have reason to believe an individual has violated immigration laws. The statute is written in the conjunctive as it requires both (1) reason to believe the individual is present in violation of the immigration laws and (2) reason to believe the individual is likely to escape before a warrant can be obtained. §1357(a)(2); § 287.8(c)(2)(ii). The First Circuit has interpreted "reason to believe" as the equivalent of probable cause. *Morales v.*

*Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (collecting cases); *see also Westover v. Reno*, 202 F. 3d 475, 479-80 (1st Cir. 2000).

36. The requirement that officers establish probable cause of flight risk before conducting a warrantless arrest requires a particularized finding of likelihood of escape before a warrant can be obtained. *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1217 (D. Colo. 2025) ("Before effecting a warrantless arrest, ICE officers must make a 'particularized inquiry' that the subject is likely to abscond."); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007–08 (N.D. Ill. 2016) (same).

37. In detaining Petitioner, ICE conducted a warrantless arrest. They did not show any documentation to Petitioner when he was apprehended and, even if it is assumed that the post-hoc I-205 is a valid arrest warrant, it was produced after the arrest had already taken place.

38. The officers who arrested Petitioner lacked probable cause to believe that Petitioner was likely to escape before a warrant could be obtained and none of the circumstances surrounding the arrest support a finding of flight risk: Petitioner voluntarily appeared at the Somerville District Court for a scheduled arraignment notwithstanding concerns expressed by friends and community members regarding recent ICE courthouse arrests. He appeared with community support, remained inside the courthouse throughout the proceeding, did not flee upon encountering ICE or attempt to evade officers. At the time of the arrest, he was consulting with appointed counsel concerning the very matter for which he had voluntarily appeared when ICE arrested him.

39. The warrantless arrest violated the limitations Congress imposed through 8 U.S.C. § 1357(a)(2). Petitioner's continued detention likewise is unlawful because he remains detained without any individualized determination that his confinement is necessary to serve the purposes of civil immigration custody. The unlawfulness of Petitioner's arrest further underscores the absence of any individualized determination that his detention was necessary at the time of arrest or remains necessary now.

**Petitioner's detention is not reasonably related to a legitimate governmental purpose.**

40. Even where Congress authorizes detention through a particular statutory or regulatory scheme, the Fifth Amendment requires that civil detention bear a reasonable relationship to the government's purposes said to justify it. Civil detention is constitutionally justified when it serves specific, nonpunitive governmental interests, principally ensuring appearance, protecting the public, and effectuating removal. *See Foucha v. Louisiana*, 504 U.S. 71, 79 (1992). Indeed, civil detention derives constitutional legitimacy from the governmental interests it serves.

41. Reinstatement does not automatically authorize detention in perpetuity where a petitioner is not yet removable. *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 226 (D. Mass. 2025). Although reinstatement may provide statutory authority for detention, that authority does not extinguish constitutional limitations. Where a noncitizen cannot presently be removed because protection-based proceedings remains pending, continued detention remains subject to the Fifth Amendment's requirement that civil confinement bears a reasonable relationship to its asserted purposes.

42. As Petitioner has requested an RFI, in its absence, no removal can proceed. Where removal is not presently executable, due process requires meaningful assurances that

continued detention remains reasonably related to its asserted purposes. Without an individualized determination, detention becomes increasingly attenuated from the purposes said to justify civil immigration detention. Petitioner has professed a fear of return to his country and thus, the government cannot remove him at this time.

43. Petitioner is presently detained under color of § 1231 following reinstatement. Nevertheless, Respondents cannot presently execute Petitioner's removal while pending statutory procedures concerning his expressed fear of return remain unresolved.

44. Where removal is not presently executable, under the Constitution, Petitioner at the very least merits an inquiry into flight risk and dangerousness to ensure that the purpose of detention is being served.

**The Fifth Amendment requires notice of the basis for physical detention and a meaningful opportunity to be heard prior to government detention.**

45. The Due Process Clause of the Fifth Amendment forbids the government from depriving any person of liberty "without due process of law." U.S. Const. amend. V. "Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). The Supreme Court has thus "repeatedly recognized that civil commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protections." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added) (citing numerous Supreme Court cases).

46. Petitioner's lack of lawful immigration status has no bearing as the Fifth Amendment of the U.S. Constitution guarantees due process to all "persons" present in the United States "whether their presence here is lawful, unlawful, temporary, or permanent." *Id*. at 693.

47. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755. "The fundamental requirement of due process is the opportunity to be heard *at a meaningful time* and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added) (citations and internal quotation marks omitted).

48. Meanwhile, "[h]abeas is at its core a remedy for unlawful executive detention." *Munaf v. Green*, 553 U.S. 674, 693 (2008) (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004)). "The typical remedy for such detention is, of course, release." *Id*. (citing *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).

49. The Fifth Amendment generally requires that governmental deprivations of liberty occur pursuant to procedures reasonably calculated to provide notice of the basis for the deprivation and an opportunity to contest it. "[T]he essential requirements of procedural due process include adequate notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner,'" *Perez-Escobar*, 792 F. Supp. 3d at 226 (citing *Aponte-Rosario v. Acevedo-Vila*, 617 F.3d 1, 9 (1st Cir. 2010)). Here, ICE officers descended upon Petitioner without explanation, without a warrant or any documentation that would explain the legal basis for the arrest. In so doing, ICE intercepted a criminal proceeding, disallowed Petitioner from engaging in the state-mandated proceeding as was his intention, transported into ICE custody before he received any notice or have the opportunity to challenge the asserted grounds for his attention.

## CLAIMS FOR RELIEF

### COUNT ONE

***Violation of the Fourth Amendment of the U.S. Constitution***

50. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

51. The Fourth Amendment protects persons within the United States from unreasonable searches and seizures.

52. Petitioner’s arrest constituted a seizure within the meaning of the Fourth Amendment.

53. Respondents arrested Petitioner without presenting a warrant.

54. The circumstances known to Respondents at the time of the arrest did not provide probable cause to believe that Petitioner was likely to escape before a warrant could be obtained. To the contrary, Petitioner had voluntarily appeared at the Somerville District Court for a scheduled arraignment, remained present throughout the proceeding, appeared with community support, consulted with appointed counsel, and did not attempt to evade, resist or flee from law enforcement officers.

55. Because Respondents seized Petitioner without a warrant and without probable cause to believe that he was likely to escape before a warrant could be obtained, the arrest was unreasonable under the Fourth Amendment.

56. Respondents continue to detain Petitioner. Regardless of the statutory basis asserted for that detention, Petitioner's ongoing confinement violates the Constitution for reasons set herein.

## COUNT TWO

***Violation of 8 U.S.C. § 1357(a)(2): Warrantless Arrests without Individualized Determination of Flight Risk and without Reason to Believe Individual was Likely to Escape before a Warrant could be Obtained***

57. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

58. 8 U.S.C. § 1357(a)(2) prohibits arrests without a warrant unless there is "reason to believe," based on an individualized assessment, that an individual is "likely to escape before a warrant can be obtained for [their] arrest."

59. Petitioner's arrest did not comply with these requirements.

## COUNT THREE

***Violation of 8 C.F.R. § 287.8(c)(2)(ii) Standards for Stops and Warrantless Arrests***

60. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

61. Respondents are bound by regulation to conform warrantless arrests to the standards in 8 C.F.R. § 287.8(c), including the requirement at 8 C.F.R. § 287.8(c)(2)(ii) that officers have reason to believe that an individual is "likely to escape before a warrant can be obtained."

62. Petitioner's arrest did not comply with these requirements.

## COUNT FOUR

***Violation of Due Process Rights under the Fifth Amendment of the U.S. Constitution Due Process***

63. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

64. Petitioner "passed through our gates" and "may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). Because Petitioner has developed an interest in remaining during his time here, "the procedures used to remove [him] must adequately protect that interest." *Kirboga v. LaRose*, 819 F. Supp. 3d 1137, 1150 (S.D. Cal. 2025) (quoting *Make the Rd. New York v. Noem*, 805 F. Supp. 3d 139, 159 (D.D.C. 2025)).

65. Respondents deprived Petitioner of liberty without procedures consistent with the traditional standards of fairness. Petitioner was arrested without any warrant, without notice of the asserted legal basis for the arrest, while participating in a state criminal proceeding and consulting with appointed counsel. These actions deprived Petitioner of liberty without constitutionally adequate process.

66. Petitioner is not removable at this time as his Reasonable Fear Interview and any attendant regulatory procedures remain pending. Respondents continue to detain Petitioner without any individualized determination that his confinement is necessary to ensure appearance or otherwise serves the limited and nonpunitive purposes that justify civil immigration detention. Because Petitioner's removal cannot presently be effectuated while regulatorily required fear-based procedures remain pending, continued detention without such an individualized determination violated the Due Process Clause.

## **Prayer for Relief**

Wherefore, Petitioner respectfully requests this Court to grant the following relief:

1. Assume jurisdiction over this matter;
2. Order that Petitioner shall not be transferred outside the District of Massachusetts;
3. Issue an order that Respondents show cause why this Petition should not be granted within five days.

4. Declare that Petitioner's current detention without constitutionally adequate process is unlawful;
5. Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately;
6. Alternatively, order Respondents to provide Petitioner with a prompt individualized custody determination before a neutral decisionmaker.
7. Award Petitioner's attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 28 U.S.C. § 2412, and on any other basis justified under law.
8. Grant any further relief this Court deems just and proper.

Respectfully submitted,

Yonatan Pineda Pineda
By his attorney,

/s/ Annery Miranda
Annery Miranda, Esq.
Greater Boston Legal Services
197 Friend Street, 8F
Boston, MA 02114
(617) 669-2440
amiranda@gbls.org

# EXH.
# A

# AFFIDAVIT OF YONATAN PINEDA PINEDA

1. My name is Yonatan Jacobo Pineda Pineda. I was born on 12, April 2000.

2. I have been in the United States since about 2020, I think. I have been living in Somerville for the past few years.

3. I am writing to tell you about how I was detained by ICE on September 16, 2026.

4. I have never had any problems with the police prior to this—not in El Salvador and not here in the United States.

5. Due to an accusation that was made against me earlier this month, I got a notice from the court in Somerville that I had to attend a hearing.

6. I told my family what was happening and told them I would attend. I also told my landlord, Adeli, who my family is very close to.

7. I knew I would attend but I was concerned that ICE would encounter me because I would see it in the news that they have been at courthouse.

8. Some friends told me not to go because ICE could pick me up at the courthouse but I wanted to do things right. I also wanted to explain to the court what happened and clear my name and my record.

9. When I told Adeli, my landlord, about the situation she told me she would go with me.

10. She said she would meet at the courthouse.

11. I arrived at around 830am. I walked to the office and there were some papers to go through. They directed me to the courtroom where I was to wait for the judge. I waited for about an hour before they called me. Not too long after I sat down to wait, Adeli entered the courtroom in support.

12. The judge called my name and asked me to approach. I don’t remember everything that was said. I didn’t understand very well.

13. The lawyer had me walk with him to the hallway. Adeli came with us. We started trying to talk and immediately three people walked up to me, and I knew immediately it was ICE. I felt really bad as they approached. My heart started racing. I got really worried but what was I to do?

14. They said they were ICE and took my hands and handcuffed me. They didn't explain anything. They started taking my belongings.

15. They did not show me any papers.

16. They put me in a black unmarked car with tinted windows. The ICE officer who was driving talked on the phone in English during what seemed like a 40 minute drive or so.

17. We arrived at Burlington, and they took my fingerprints, they took a picture of me, they asked me some questions. I felt really flustered and nervous. When I think back to the encounter, I have trouble remembering some of it. They did not give me any documents at this point. They had me sign things, but I can't tell you what it was. I was very overwhelmed.

18. They placed me in a small room or cell with about fifteen people or so. All of them were Latinos.

19. I want to say we stayed in that room until nighttime and they moved me to Plymouth that night.

20. When I woke up and looked at where I was, I felt sad and confused about what would happen to me. I just told myself I have to wait and see.

21. I was able to talk to my sister and she told me that I had some lawyers working on my case.

22. The morning of my court hearing in Somerville I hadn't been thinking about El Salvador but the more I thought about it and talked to Salvadorans and my family, the more I began to fear the changes my country has gone through. I have huge visible tattoos and now this record. Even though I have never been involved with gangs that doesn't seem to matter to the Salvadoran government. I fear that I could be detained in El Salvador under the State of Exception.

23. My lawyers came to visit me and showed me some papers. One of the papers they showed me was apparently had my picture and I recognized that this was a recent picture and taken in Burlington after my arrest.

Signed under the pains and penalties of perjury on September 26, 2026,

/s/ *Yonatan Pineda Pineda*
Yonatan Pineda Pineda, Petitioner

# EXH.
# B

**AFFIDAVIT OF BLANCA ARELI PENA PORTILLO IN SUPPORT OF YONATHAN PINEDA PINEDA'S HABEAS PETITION**

1. My name is Blanca Areli Pena Portillo. I am a United States citizen and have been a resident of Somerville, Massachusetts for thirty years.
2. My husband and I are homeowners and have been renting to Yonathan since he began living in Somerville. It has been a few years.
3. Over those years, we have gotten to know Yonathan well. He is respectful, calm and hardworking. We have come to really care about him. I believe he has most recently been working in landscaping.
4. Throughout the time we have known him he has had no encounters with police or any criminal record. When I became aware that his girlfriend had made an accusation against him based on an argument they had, I wanted to support him. I have lived in the same house as Yonathan for years and I have never heard him even raise his voice. I also spoke to people who were there during the argument and he was not the aggressor. This was a misunderstanding and we were all hoping he could explain to the court what happened on that day.
5. Yonathan had several people telling him not to show up to his arraignment because ICE has been taking people from the court. I admire Yonathan's response to them: that he was going to show up because he wanted to do things the right way. This impulse to do things right aligns with my experience of him and his family and the type of person he is. That said, I was worried.
6. His court notice said his arraignment was at 8:30am on September 16, 2026. My morning got a little complicated and I couldn't leave the house when I had planned but I had every

intention of attending to support Yonathan. Yonathan, worried about being late, took a taxi to the courthouse.

7. When I arrived, I entered the courtroom and sat with him until his name was called. They assigned an interpreter who was translating incorrectly which worried me.
8. I observed a young woman and a young man sitting in the courtroom in plain clothes observing the hearing.
9. When Yonathan was assigned a lawyer who invited us to speak to him in the hallway, the woman and young man followed. As the lawyer spoke to Yonathan, I observed the couple walking up to this ICE officer that had been in the hall. My heart started racing. I knew what was about to happen.
10. It seemed to me like the officers were watching for people in the courtroom that day and seeing who they could take.
11. The officer and the plain-clothes couple walked right up to Yonathan, grabbed his hands and arrested him.
12. They showed Yonathan no paperwork.
13. They did not offer explanation about why this was happening to him.
14. As the officers grabbed his hands, Yonathan looked like a deer in headlights. He stood there with his backpack staring blankly ahead. He looked so young to me. I became so sad for him. The only thing I could think to do was offer him his sweater. I have heard those places they take you to can get cold.
15. Yonathan was never able to respond to the accusation made against him in court.
16. This situation saddens me deeply. Over the years I have known Yonathan, I have known him to be hardworking, respectful and kind. In fact, he exhibits a kind of innocence that

makes those of us who know him want to protect him. His family is devastated as I am that he has been taken in this way. I worry about how he is doing in detention.

Signed under the pains and penalties of perjury on this 4th day of October 2026.

*/s/ Blanca Areli Pena Portillo*
Blanca Areli Pena Portillo

# EXH.
# C

Outlook

## Request for Reasonable Fear Determination - PINEDA PINEDA, Yonatan J. - A 215-947-710

**From** Pisha, Schuyler <SPisha@gbls.org>
**Date** Mon 9/28/2026 2:23 PM
**To** Boston.Outreach <boston.outreach@ice.dhs.gov>
**Cc** Miranda, Annery <AMiranda@gbls.org>; Song, Yong Ho <YSong@gbls.org>; AsylumD3Prescreening@uscis.dhs.gov <asylumd3prescreening@uscis.dhs.gov>

5 attachments (16 MB)

PINEDA - Reasonable Fear Request.pdf; PINEDA-PINEDA - I-589.pdf; PINEDA-PINEDA - Supporting Documents.pdf; PINEDA-PINEDA - G-28 ICE.pdf; PINEDA-PINEDA - G-28 USCIS.pdf;

Dear Officer,

I am writing on behalf of my client, **Mr. Yonatan Jacobo Pineda Pineda (A 215-947-710)** a Salvadoran National with a reinstated removal order who is currently detained by ICE at the Plymouth County Correctional Facility.

As indicated in the attached form I-589, Mr. Pineda Pineda fears torture and persecution in his native country of El Salvador.

**Please provide him with a Reasonable Fear Interview as soon as possible.**

Attached please find the following submissions in support of this request:

1. form G-28 naming me as attorney of record (USCIS);
2. form G-28 naming me as attorney of record (ICE);
3. form I-589 indicating Mr. Pineda Pineda's fear of return;
4. written request for Reasonable Fear Determination detailing the reasons why Mr. Pineda Pineda's fear is reasonable in light of current country conditions in El Salvador; and
5. initial document submission establishing the current country conditions in El Salvador.

On Friday, I sent this request to AsylumD3prescreening@uscis.dhs.gov. I received a response directing me to contact ICE instead.

**Please confirm receipt of this email.**

Respectfully submitted,

Schuyler Pisha, Esq.
Senior Attorney
Immigration Law Unit

Greater Boston Legal Services
197 Friend Street
8th Floor
Boston, MA 02114

Mobile: 617-304-3013

---

**From:** Pisha, Schuyler <SPisha@gbls.org>
**Sent:** Friday, September 25, 2026 4:12 PM
**To:** AsylumD3Prescreening@uscis.dhs.gov <AsylumD3Prescreening@uscis.dhs.gov>
**Cc:** Miranda, Annery <AMiranda@gbls.org>; Song, Yong Ho <YSong@gbls.org>
**Subject:** Request for Reasonable Fear Determination - PINEDA PINEDA, Yonatan J. - A 215-947-710

Dear Officer,

I am writing on behalf of my client, **Mr. Yonatan Jacobo Pineda Pineda (A 215-947-710)** a Salvadoran National with a reinstated removal order who is currently detained by ICE at the Plymouth County Correctional Facility.

As indicated in the attached form I-589, Mr. Pineda Pineda fears torture and persecution in his native country of El Salvador.

**Please provide him with a Reasonable Fear Interview as soon as possible.**

Attached please find the following submissions in support of this request:

1. form G-28 naming me as attorney of record;
2. form I-589 indicating Mr. Pineda Pineda's fear of return;
3. written request for Reasonable Fear Determination detailing the reasons why Mr. Pineda Pineda's fear is reasonable in light of current country conditions in El Salvador; and
4. initial document submission establishing the current country conditions in El Salvador.

**Please confirm receipt of this email.**

Respectfully submitted,

Schuyler Pisha, Esq.
Senior Attorney
Immigration Law Unit
Greater Boston Legal Services
197 Friend Street
8th Floor
Boston, MA 02114

Mobile: 617-304-3013